## CENTRAL HANOVER BANK & TRUST CO. et al. v. SETLOW.
### No. 447.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1933.

William G. McKnight and William T. Hedlund, both of New York City, for complainants-appellants.

Drury W. Cooper, of New York City, Carlton Hill, of Chicago, Ill., and Thomas J. Byrne, of New York City, for defendant-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The complainants are the legal and equitable owners of United States letters patent No. 1,520,936 to James H. Dennedy, granted December 30, 1924. The suit is for infringement, and the claims in issue are Nos. 3, 4, 5, and 7 to 13, inclusive.

The specification sets forth the alleged invention in general terms as follows:

"This invention relates to artificial refrigerating systems in which a refrigerant body such as sulphur dioxide, methyl chloride or similar chemical is compressed and liquefied and then cooled and allowed to expand in a coil within a storage compartment, brine tank or the like, and the particular feature of this invention is in the provision of means to control the temperature of the storage compartment or body to be cooled through variation in pressure of the expansion side of the system. The apparatus is intended to be operated by an electric motor as is usual with systems of this character but other motive power may be utilized if desired. The means employed for stopping and starting the electric motor, as is preferably used, is an electric switch adapted to connect and disconnect the motor with the source of energy. Heretofore, the temperature of the storage compartment is maintained between certain high and low limits by means of a thermostat which is adapted either through the expansion and contraction of a bi-metallic element or actuation of other means sensitive to temperature change to open and close the circuit to the motor. In the apparatus herein disclosed a pressure controlled switch is utilized subject to the influence of variation in pressure in the expansion side of the system, a certain high pressure resulting in the closing of the switch to start the system into operation, and a predetermined low pressure opening the switch and causing cessation of operation of the motor, the switch being adjustable to permit the device to be set to operate at different pressures. An automatically operating valve is also employed between the high and low pressure sides of the circulating system and preferably with a pressure operated device for maintaining the temperature of the storage compartment within certain limits. I prefer to employ an automatic valve of a character to maintain a constant quantity of refrigerant in the expansion side of the system. In systems of this general character, upon cessation of operation of the compressor, the pressure on the low pressure sides of the system tends to increase due to absorption of heat from the body or compartment being cooled. With a pressure controlled device controlling operation of the refrigerating apparatus, the pressure of the expansion side may be held between certain limits of high and low pressure by which means the temperature of the refrigerated compartment is directly controlled by the apparatus herein disclosed."

It is familiar scientific knowledge that the boiling or vaporizing of a liquid takes up heat whether such boiling takes place above or below atmospheric temperature. Sulphur dioxide vaporizes below atmospheric temperature is used in refrigeration, and is one of the chemicals recommended by the patentee for use in his system. There is a definite relation between the vaporization temperature of a liquid refrigerant and the pressure of its refrigerant vapor. In general, when the temperature in the refrigerator coil rises the pressure therein also rises, and when the temperature falls the pressure decreases. A pressure of two and one-half pounds per square inch is necessary to maintain equilibrium or stability between the sulphur dioxide vapor and the liquid when the latter is at a temperature of 20 degrees Fahrenheit. This relation of pressure and temperature is fixed. It is impossible to reduce the pressure and still maintain the liquid refrigerant at less than its vaporizing temperature. Any reduction in vapor pressure is accompanied by an instantaneous boiling of the liquid refrigerant and a liberation of more vapor, thus maintaining a balance between the pressure of the vapor and the temperature of the liquid.

It is by virtue of the foregoing law of thermo dynamics that the apparatus of the patentee operates. It comprises an evaporator contained in the compartment to be refrigerated. The walls of the compartment are insulated so that the refrigerated space may be maintained cooler than the surrounding atmosphere. The coil or evaporator is placed within the compartment, and a pipe line discharging into the evaporator is connected by a suction pipe to the inlet of a compressor. The compressor reduces the pressure in the evaporator above the liquid

by sucking the vapor from the evaporator and then compresses it to a pressure appreciably higher than the pressure in the evaporator so that the vapor may be condensed. An outlet pipe from the compressor leads into a condenser located in the base of the compressor where the high-pressure vapor is cooled with water or a blast of air and converted into high-pressure liquid. Between the outlet of the condenser and the evaporator is a valve which divides the high-pressure side from the low-pressure side of the circuit. The valve (which in practice is a float valve) tends automatically to maintain within the evaporator a constant volume of refrigerant on the low-pressure side of the system. As the temperature of the refrigerant in the evaporator decreases through evaporation, the pressure of the refrigerant also decreases, and as the temperature of the refrigerant increases, the pressure also increases. The effect of this increased pressure by the vapor is to close a switch and to start an electric motor. When the motor is in operation it sucks excess vapor from the evaporator into the compressor. It is there compressed and carried into the condenser, where it is cooled and converted into its original liquid form and then, by means of the float valve, fed into the evaporator to replace the liquid that has boiled away and in so doing absorbed heat and refrigerated the compartment. After the excessive pressure from the vapor is released, the switch regulating the motor is opened by a spring of sufficient power to overcome the decreased pressure in the evaporator. Thus the electric circuit is broken and the motor is idle until renewed pressure of the vapor again closes the switch and inaugurates another cycle of operation. An adequate supply of the refrigerating fluid is thus maintained in the evaporator ready to vaporize and restore the temperature of the compartment whenever it rises beyond the predetermined limit.

Judge Thomas, who tried the case, held that if the patent should be regarded as valid the defendant's system infringed the claims in issue. Of this we can have little doubt, for to limit them, as the defendant suggests, would really be to give them no scope at all. But the judge dismissed the bill in view of United States patent No. 442,026 to Facer and United States patent No. 1,425,266 to Marshall (the second Marshall patent). In this connection he stated that the alleged combination in the claims was a mere aggregation lacking patentability. Reliance upon the doctrine of so-called "aggregation" to defeat a patent involves obscurity and seems to contribute little to any attempt to define the limits of patentable invention. We must always come back to the question whether the elements joined in a claim produce such a novel and useful result as to be worthy of a patent. The prior art in the field of refrigeration is so close to everything shown in Dennedy's patent as to preclude invention.

All of the claims in issue recite the elements of a refrigeration system long well known: A compressor, condenser-receiver, expansion valve, evaporator, and pipe extending back to the compressor, likewise a control for stopping and starting the motor and compressor by variation of pressure in the suction line.

In United States patent No. 1,276,612 to Bechtold and Mellowes there is a control by a thermostat placed in the food box in place of the suction pressure control of Dennedy, and this same control was used in the early Frigidaire system of 1920. Otherwise there is correspondence with Dennedy. In United States patent No. 442,026 to Facer there was a substantial disclosure of the Dennedy invention. Facer says that in his invention a "refrigerant in a liquid state is forced into the refrigerating-pipes, where it volatilizes and absorbs the heat in so doing, the gas being afterward reconverted into a liquid state by mechanical compression * * *." He adds that the parts of the apparatus shown and described relate to a mechanism "which draws the volatilized refrigerant from the refrigerating-pipes, and thus reduces the pressure therein according to the continuity of its action, and thereby proportionately increases the rapidity of the volatilization and consequently the refrigerating effects of said volatilization, and to the mechanism which compresses the gas from the refrigerating-pipes, and thereby reduces it to a liquid and passes this liquid indirectly to the refrigerating pipes, there to be again volatilized to produce refrigeration." He further says that his invention "relates to the mechanism which moves as the pressure in said pipes varies and automatically controls the continuity of the action of the * * * apparatus to the end of securing the proper rate of volatilization within said pipes for preserving an even temperature within the chamber being cooled thereby."

He summarizes thus: "The apparatus in its entirety is a contrivance designed to produce low temperature within a certain confined space by the continual use of the same refrigerating medium, that is to say, by the

continued volatilization and liquefaction of a given quantity of the aggregating medium and to act automatically to so govern the rate at which these changes in the condition of the medium occur that there shall be preserved within said space a substantially even temperature during an indefinite period."

It is argued that Facer failed to disclose an operable device and particularly that he gave no instructions as to the form of the expansion valve. He says, however, that: "The liquid refrigerant is forced into the refrigerating-pipes through a suitable valve, which may be automatic or otherwise, whereby the rapidity of the flow is regulated." Float valves for such purposes were known, and the introduction and use of such a valve in Facer's apparatus required no more than mechanical skill.

It is also contended that Facer's diagram shows a pipe running from the bottom of the evaporator and that a pipe so installed would prevent a stock of liquid from remaining in the evaporator. It may be that there was an error in design in this respect, but if it is as plain as it seems on the face of the drawing, it was readily capable of correction and not sufficient to defeat the plain objects of the inventor. Manhattan Book Casing Mach. Co. v. E. C. Fuller Co. (C. C. A.) 204 F. at page 287.

It is also argued that the amount of liquid in Facer's apparatus would not be constant, as is said to be the case with Dennedy's; but it would be ample, which is all that is necessary, to carry out the object of either patent, for if the amount of liquid admitted by the valve to the evaporator were not sufficient to maintain a proper stock of refrigerant liquid on the low side, the suction pressure control would not operate to start the motor. Facer's suction pressure control was intended to control the temperature of the refrigerant liquid in the evaporator by starting and stopping the operation of the motor and compressor according to the refrigerant vapor pressure. He says in the specification at page 2, lines 98–113: "I have arranged in connection with the devices above explained mechanism whereby the pressure of gas within the refrigerating-pipes is automatically controlled by the starting and the stopping of the pumping mechanism. I have found that when this pressure is between fifteen and twenty pounds the results are very satisfactory, and the mechanism which I shall presently describe is therefore preferably arranged to stop the pump when the pressure falls below fifteen

pounds and to start it again when it is more than twenty pounds; but the mechanism is adapted to be adjusted so that the pump may be stopped and started at any predetermined degrees of pressure."

If it be said that the Facer patent is old and has drawings that are inadequate or show an inoperative structure, it seems clear that United States patent No. 1,425,266 to Marshall (Marshall No. 2) disclosed the Dennedy invention. It is said that this patent relied on thermostatic control. Even the earlier Marshall patent, No. 1,425,265, shows a switch responsive to pressure from the evaporator and thereby a means of stopping the compressor when the suction pressure goes too low, but it seems to rely on thermostatic control to start the motor. In evaporator 85 of the second Marshall patent, however, the switch was both closed and opened through pressure control. It may readily be segregated from the other units of the system. It discloses all the elements of Dennedy's claims. With its expansion valve 71 and float control 89 it provides means for maintaining a constant level and a constant volume of liquid refrigerant in the low side and accordingly a constant area of heat absorption between the liquid refrigerant and the walls of the evaporator.

The drawings are criticized because they do not show the outlet pipe 91 extending from a level above the float. It is said that because of this any liquid entering the float chamber 88 will run out into the pipe 91 without lifting the float. But it is clear that this position of pipe 91 with reference to the float chamber was a mere inadvertence in drafting which could readily be corrected by introducing the pipe 91 near the top of the float chamber.

Trap 16 is criticized because no method is shown for draining it. Such a trap is not found in Dennedy. It cannot be more than a means of catching waste liquid sucked through with the gas, for the whole plan of operation requires that the pipes leading from the float chamber shall carry only vapor. Defendant's witness Schwartz was right when he said that trap 16 "is of no particular interest * * * except that it is an additional device for preventing any entrapped liquid or any liquid that enters the suction pipe from getting back to the compressor, which would be a bad thing * * *." Record p. 146.

It is further objected that the second Marshall patent shows the float chamber 88 on the outside of the box. This is a trifling criti-

cism. It at most means that a small part of the refrigerant would not respond to the box temperature. It could hardly be regarded as an invention for Dennedy to place the float chamber in the box to be cooled.

For the foregoing reasons the decree is affirmed.